IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| JIMMIE ALAN LANE ) | Case No. 09-38211-DOT |
| ) | Chapter 7 |
| Debtor ) | |
| _____) | |
| ) | |
| TERESA G. CAVINESS, ) | |
| Individually and as Trustee in Dissolution ) | |
| for Metis/America Marketing, Inc. ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Adversary Pro. No. 10-03059-DOT |
| ) | |
| JIMMIE ALAN LANE ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Trial was held November 15 and 16, 2010, on the complaint of plaintiff Teresa G. Caviness, individually and as trustee in dissolution for Metis/America Marketing, Inc. (Metis), to determine the dischargeability of indebtedness of debtor Jimmie Lane. The complaint alleges three counts pursuant to provisions of 11 U.S.C. § 523(a)(2), (4), and (6). At the conclusion of trial, the court ruled from the bench that the § 523(a)(2) and (a)(6) counts would be dismissed due to insufficient evidence. The court also made a preliminary ruling from the bench that debtor had made unauthorized withdrawals from Metis without permission and requested counsel to submit proposed findings of facts and conclusions of law as to the amount of debtor's liability under § 523(a)(4).

1

For the reasons stated in this opinion, the court finds that debtor committed embezzlement within the meaning of 11 U.S.C. § 523(a)(4), and plaintiff Metis is entitled to a nondischargeable judgment in the amount of $134,377.38.

## Procedural Posture

On December 16, 2009, debtor filed a voluntary chapter 7 bankruptcy petition. Plaintiff commenced this adversary proceeding on March 25, 2010, to determine the dischargeability of debts pursuant to 11 U.S.C. §§ 523(a)(2), (4), and (6) and Rule 7001(6) of the Federal Rules of Bankruptcy Procedure.

## Jurisdiction and Venue

The Court has subject matter jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334 and the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (I). Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409(a).

## Findings of Fact

The allegations in the complaint stem from financial dealings by the debtor involving various bank accounts of Metis, a Virginia corporation in dissolution[1] that operated as a small advertising agency from its formation in the late 1990s[2] until its dissolution in 2009. Both Teresa Caviness and debtor joined Metis in the early 2000s. At that time, Jonathan Lyle was the corporation's sole shareholder. Caviness became the president of Metis and a director of the

---

[1] Metis was dissolved pursuant to an order of the Circuit Court for the City of Richmond entered December 18, 2009. *See infra*.

[2] The original principals of Metis were Jonathan and Sherrill Lyle. Neither was employed by or otherwise connected to Metis in the pertinent time period involved in this case. Robert Smith was the attorney who assisted in the formation of the corporation.

corporation and debtor became the corporate secretary as well as a director. In 2003, Caviness became a one-third shareholder in Metis, paying for her interest in full. In 2004, debtor also became a one-third shareholder, purchasing stock by delivering an $81,000.00 promissory note to Metis. In early 2007, Caviness and debtor arranged to purchase principal Jonathan Lyle's remaining shareholder interest, and they became equal one-half shareholders in the corporation.[3] In connection with this buyout, on March 7, 2007, Metis entered into a $350,000.00 maximum principal loan agreement with Wachovia Bank, N.A.[4] Metis, acting by Caviness and debtor, made and delivered a $350,000.00 note to Wachovia. Caviness and debtor also gave personal guaranty agreements to Wachovia in connection with the loan.

Metis enjoyed a profitable 2007, but the recession of 2008 greatly impacted the corporation's bottom-line. While Caviness and debtor received $120,000.00 in salaries in 2007, in 2008 their salaries were reduced to $54,850.00 and $55,898.00, respectively. Additionally, the slowing economy prompted Metis to lay off Nicole Valentino, the corporation's in-house bookkeeper, in September 2008. Thereafter, with Caviness's consent, debtor assumed control of the Metis finances. Debtor retained sole control of the corporation's books through June 15, 2009.

Prior to debtor assuming control of the corporation's books, a standard reimbursement procedure had been in place at Metis. Debtor and other employees would provide documentation supporting any expenses and complete a reimbursement form. Bookkeeper Nicole Valentino would then prepare the reimbursement check using the corporation's QuickBooks software, and

---

[3] Prior to this purchase, Jonathan Lyle, Caviness, and debtor had been equal one-third shareholders.
[4] This new loan agreement was, at least in part, required in order to remove Lyle as guarantor of an existing loan Metis held with Bank of America, N.A.

then debtor would sign the check. However, shortly before Valentino's departure, debtor began to prepare hand-written checks without providing proper documentation to the bookkeeper. The transfers by debtor that form the basis of the plaintiff's complaint began in 2007 and continued through late 2009, shortly before debtor resigned his position with the corporation.

On April 3, 2009, debtor approached Caviness and requested a personal loan in the amount of $8,000.00. He offered Caviness a piece of paper indicating a baby grand piano as potential collateral. However, Caviness did not retain the paper and did not rely upon the document when she loaned him the $8,000.00 from her personal funds.

Earlier, in 2008, the accounting firm of Martin, Dolan & Holton was engaged to prepare income tax documents for Metis and to assist with its bookkeeping. In 2009, Barbara Ebert, a certified public accountant with that firm, began the process of reconciling the books and records of Metis in order to prepare the corporation's 2008 1120S income tax return. In reviewing these books and records, Ebert noticed that entries in the Metis books and records for expense reimbursements had shifted over the course of 2007 and 2008. Initially, she noticed that rather than money flowing in and out of the account for reimbursements, more and more money was simply flowing out of the account, as if for loans. Additionally, the figures had gone from more typical reimbursements with odd totals (e.g. $3,321.52) to simple, round numbers such as thousands of dollars. On June 12, 2009, Ebert contacted Caviness about the changes to the account.

In response, Caviness went to Metis's office and unsuccessfully attempted to access the QuickBooks software. On Sunday, June 14, 2009, Caviness contacted the company's counsel,

Robert Smith. On Monday, June 15, 2009, Caviness went to Smith's office and was present when he telephoned debtor, who at the time was present in the Metis office.

As soon as Smith identified himself to debtor and indicated that Caviness was present with him in the room, debtor immediately revealed that he had taken money from Metis without informing Caviness. Furthermore, debtor immediately apologized for his actions and explained that he was heavily in debt; he also agreed to furnish the QuickBooks password, which he did on a subsequent call. After speaking to Smith, debtor walked to the office of Metis employee Katrin Mattoon and admitted that he had failed to disclose withdrawals to Caviness.

Later that day, June 15, debtor sent an e-mail to Caviness apologizing for his withdrawals. On June 16, 2009, debtor sent another e-mail to Caviness, this time copying Smith, and discussing dishonored checks and expressing a desire to repay the money he had taken.[5] In subsequent e-mail exchanges, debtor expressed similar remorse about his actions. In total, debtor had withdrawn $108,049.82 from the Metis Wachovia account during the period covering 2007 through 2009. After accounting for legitimate expense reimbursements,[6] the total of unauthorized withdrawals for debtor's personal use amounts to $96,783.14.

Despite his expressions of regret to Caviness, debtor promptly began a new scheme for taking money from Metis. On June 22, 2009, he opened a deposit account in Metis's name with Branch Banking & Trust Company,[7] representing himself to BB&T as the president and CEO of

---

[5] Upon learning of debtor's withdrawals, Caviness had paid some $26,000.00 in Metis's American Express bills. This payment apparently caused several other checks drafted by debtor to various vendors to bounce. Debtor did not reveal the outstanding checks at the time of the June 15, 2009, conversation with attorney Smith.

[6] While many of the withdrawals are inadequately documented, the Court finds that prepared checks in odd amounts are more likely legitimate reimbursements.

[7] Debtor opened the account with a $3,000.00 check to Metis from its client Lendmark Financial Services.

Metis, even though Caviness was the president and the corporation did not have a CEO.[8] Additionally, he requested that all statements regarding the BB&T account be sent to his home address, rather than to Metis. Debtor did not have Caviness's consent to open the account, nor did he inform her of his actions.

From the opening of the BB&T account through September 28, 2009, debtor deposited to the account a total of $166,213.30.[9] Of this total, he withdrew the amount of $4,939.45 in debit card transactions for purely personal expenses, such as groceries and fast food. A further $32,654.79 was identified in payments made directly to debtor or made to third parties on his behalf, such as utility bills. These personal expense transactions and withdrawals totaled $37,594.24. An additional $80,504.81 was paid directly to or on behalf of Metis from the BB&T account. The plaintiff was unable to determine the destination of the remaining $48,144.25 from the account.[10]

In early October 2009, Caviness discovered the existence of the BB&T account. With attorney Smith's assistance, she demonstrated her senior position in the company to BB&T, and the bank agreed to freeze the account on October 8, 2009. The account was closed the next day, and a remaining balance of $12,412.39 was transferred to the Metis Wachovia account on October 12, 2009. Debtor responded the very next day by opening another account in Metis's

---

[8] During his testimony, debtor stated that he "had authority to open the account. So to [him] it was a non-event in terms of the title." Debtor claimed the title of president on the corporate resolution he signed at BB&T and the title of CEO on the account signature card.

[9] The parties agree that debtor deposited $2,090.00 of his own money into the account. Due to the intermingling of these funds with the much larger total of Metis funds, it is impossible to distinguish when and to whom these personal funds were paid.

[10] In the Proposed Findings of Fact and Conclusions of Law submitted by the plaintiff, the unidentified portion was calculated to be $45,144.25.

name, this time with Bank of America. Although he did not reveal the account's existence to Caviness, she quickly discovered it and caused it to be closed.

In September 2009, prior to the closing of the BB&T and Bank of America bank accounts, Caviness initiated a dissolution lawsuit for Metis in the Circuit Court of the City of Richmond. On October 27, 2009, during the pendency of that proceeding and shortly after the closure of the Bank of America account, debtor resigned his position at Metis. Debtor filed this chapter 7 case on December 16, 2009. The City of Richmond Circuit Court issued its dissolution decree for Metis on December 18, 2009, and appointed Caviness as Trustee in Dissolution.

## Discussion and Conclusions of Law

Plaintiff's complaint alleges three counts against debtor under Section 523(a). Count I alleges that the personal loan of $8,000.00 from Caviness to debtor should be excepted from discharge for fraud under 11 U.S.C. § 523(a)(2). Count II alleges that debtor committed fraud and defalcation while acting in a fiduciary capacity, embezzlement, and larceny under 11 U.S.C. § 523(a)(4) when he withdrew funds for personal use from the Wachovia and BB&T accounts. Count III alleges that by his actions, debtor committed willful and malicious injury to Metis, within the meaning of 11 U.S.C. § 523(a)(6).

Plaintiff bears the burden of proving that a debt should be excepted from discharge under 11 U.S.C. § 523(a) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

The court ruled from the bench at the conclusion of trial on November 16, 2010, that Counts I and III would be dismissed due to insufficient proof. These Counts will be addressed first.

<u>Count I: 11 U.S.C. § 523(a)(2)</u>

Section 523(a)(2) of the Bankruptcy Code incorporates two closely related but discrete categories of debts that are excepted from discharge in bankruptcy.[11] As the Supreme Court explained:

> One applies expressly when the debt follows a transfer of value or extension of credit induced by a falsity or fraud (not going to financial condition), the other when the debt follows a transfer or extension induced by a materially false and intentionally deceptive written statement of financial condition on which the creditor reasonably relied.

*Field v. Mans*, 516 U.S. 59, 66 (1995). Section 523(a)(2)(A) states in part:

> A discharge under section 727 … of this title does not discharge an individual debtor from any debt for money, property, services … to the extent obtained, by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). To prevail under this subsection, a plaintiff must prove:

(1) That the debtor made a representation;
(2) That at the time the representation was made, the debtor knew the representation was false;
(3) That the debtor made the false representation with the intention of deceiving the creditor;
(4) That the creditor relied on such representation; and
(5) That the creditor sustained the alleged loss and damage as the proximate result of the false representation.

*Elrod v. Bowden (In re Bowden)*, 326 B.R. 62, 82 (Bankr. E.D. Va. 2005). The Fourth Circuit has held that under § 523(a)(2)(A), a plaintiff need only meet the minimal standard of justifiable reliance on the debtor's representations rather than the higher standard of reasonable reliance. *In re Biondo*, 180 F.3d at 135; *see also Field v. Mans*, 516 U.S. 59 (1995).

---

[11] In her complaint, the plaintiff did not distinguish between the two subsections of 11 U.S.C. § 523(a)(2). Therefore, the court will address both subsections.

Section 523(a)(2)(B) applies to a related but factually distinct set of circumstances. It states in part:

> A discharge under section 727 … of this title does not discharge an individual debtor from any debt for money, property, services … to the extent obtained, by use of a statement in writing that is materially false respecting the debtor's … financial condition on which the creditor … reasonably relied and that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B). In contrast to § 523(a)(2)(A), § 523(a)(2)(B) holds the creditor to the standard of objective reasonableness. *See, e.g.*, *I.H. Mississippi Valley Credit Union v. O'Connor (In re O'Connor)*, 149 B.R. 802, 809 (Bankr. E.D. Va. 1993).

Regardless of whether one applies the justifiable reliance or objectively reasonable reliance standards to the facts here, plaintiff Caviness has failed to meet her burden of proof for Count I. Although the documentation has been lost, it is possible that debtor made misrepresentations about the baby grand piano he allegedly offered as collateral on the $8,000.00 personal loan from Caviness. This question need not be decided, however, as it is unproven that Caviness relied on debtor's representations in any way when deciding to advance him the loan. In April 2009, Caviness and debtor had a positive working relationship, and Caviness simply chose to make the loan to debtor without regard for his note. The fact that debtor may have been making unauthorized withdrawals from the Metis bank accounts does not establish that debtor made fraudulent representations in connection with the $8,000.00 loan. Accordingly, Count I must be dismissed for lack of proof.

Count III: 11 U.S.C. § 523(a)(6)

Section 523(a)(6) of the Code bars debtors from receiving a discharge for any debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."

11 U.S.C. § 523(a)(6). The Supreme Court has found injuries to be willful only when a court can determine that the debtor both intended the act and intended by the act to cause injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Id.* (emphasis in original).

Since *Geiger*, courts have differed as to whether a debtor must have specifically intended the injury or whether committing an intentional tort "substantially certain to result in injury" would satisfy the willfulness requirement. *Johnson v. Davis (In re Davis)*, 262 B.R. 663, 670 (Bankr. E.D. Va. 2001). In *Singh v. Sohail (In re Sohail)*, 2009 Bankr. LEXIS 1911, *18 (Bankr. E.D. Va. June 25, 2009), *aff'd*, 2010 U.S. Dist. LEXIS 103214 (E.D. Va. Sept. 29, 2010), Judge Huennekens of this court adopted the "objective substantial certainty" test, also known as the "subjective motive" test.

The malice element of § 523(a)(6) remains quite broadly defined. "In bankruptcy, debtor may act with malice without bearing any subjective ill will toward plaintiff creditor or any specific intent to injure same." *Johnson v. Davis*, 262 B.R. at 670; *see also In re Stanley*, 66 F.3d 664, 667 (4th Cir. 1985). "Debtor's subjective mind set is central to the inquiry as to whether debtor acted deliberately in knowing disregard of a creditor's rights in property." *Johnson v. Davis*, 262 B.R. at 670–71.

"To obtain a determination of nondischargeability under § 523(a)(6), a creditor must ultimately prove three elements: '(1) the debtor caused an injury; (2) the debtor's actions were willful; and (3) that the debtor's actions were malicious.'" *Ocean Equity Group, Inc. v. Wooten (In re Wooten)*, 423 B.R. 108, 128 (Bankr. E.D. Va. 2010) (quoting *E.L. Hamm & Assoc., Inc. v.*

10

*Sparrow (In re Sparrow)*, 306 B.R. 812, 834 (Bankr. E.D. Va. 2003)). In this case, while debtor's actions did cause injury to Metis and to Caviness personally, there was insufficient evidence of malice or even willful injury. Although debtor did not have permission to withdraw the funds, he testified that he intended to repay the corporation at some point, and in fact he made some small repayments from his own banking account amounting to $2,090.00. While debtor siphoned funds for his own use, he also continued to use the same accounts to pay Metis bills and keep the corporation operational. In addition, and despite bankruptcy's broad definition of malice, there was no evidence to suggest that debtor acted with malice towards Metis as a corporation or towards its ultimate financial security. While his actions were unwise, thoughtless, and selfish, the evidence does not show that they were malicious. Thus, Count III must also be dismissed for lack of proof.

## Count II: 11 U.S.C. § 523(a)(4)

Section 523(a)(4) excepts debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" from discharge. 11 U.S.C. § 523(a)(4).

The critical facts for determining this exception from debtor's discharge occurred in 2009 when it was discovered that debtor had written checks for his personal benefit from the Metis Wachovia Bank account as well as his opening and use of two other undisclosed bank accounts. In testimony, debtor defended most of these transactions by claiming that he had an agreement with Caviness that he could borrow at will from Metis and pay the loans back when the corporation returned to profitability. As discussed below, debtor had no such agreement, and his withdrawals were without authority.

Three separate and distinct situations are contemplated by § 523(a)(4).

FRAUD OR DEFALCATION IN FIDUCIARY CAPACITY

First, a debt may be excepted from discharge if the debtor commits fraud while acting in a fiduciary capacity. "In the bankruptcy context, the term 'fiduciary' is narrowly construed, and 'fiduciary capacity' is limited to actions by individuals under express or technical trusts that are in existence before the defalcation upon which the claim is based." *Global Express Money Orders, Inc. v. Davis (In re Davis)*, 262 B.R. 673, 682 (Bankr. E.D. Va. 2001). The Court of Appeals for the Fourth Circuit has not issued a published decision on the "proper contours of the term 'fiduciary' as used in § 523(a)(4)." *See Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493, 497, note 6 (4th Cir. 2008). And the court of appeals has apparently not rendered a decision on the applicability of the statute to corporate officers or directors.

In *KMK Factoring, L.L.C. v. McKnew (In re McKnew)*, 270 B.R. 593, 625 (Bankr. E.D. Va. 2001), Judge St. John embarked on a lengthy bankruptcy case law analysis on whether a corporate officer or director stands in a fiduciary capacity to their corporation for purposes of § 523(a)(4). He found that courts in some jurisdictions do impose a fiduciary duty on corporate officers who, for example, receive compensation improperly. *Id.*, 625-28. Judge St. John found, however, that the bankruptcy courts in the Eastern District of Virginia "are reticent to impose liability under § 523(a)(4) except in those instances where the Courts found an express trust in existence," and in *McKnew*, he held that a co-manager of a Virginia limited liability company who took unauthorized compensation was not a fiduciary for purposes of § 523(a)(4). *McKnew* at 624, 630.

In *Strack*, the Fourth Circuit made clear that on the issue of whether a trust has been created for § 523(a)(4) purposes the bankruptcy court must look to state law "for guidance."

*Strack* at 498. Virginia law is clear that officers and directors of corporations occupy a fiduciary relationship to the corporation and its stockholders. 4B M.J. *Corporations* § 195 (2007). Assuming debtor was a fiduciary of Metis, the question remains whether he was a fiduciary under an "express or technical trust . . . in existence before the defalcation . . . ." *In re Davis*, 262 B.R. at 682. Notwithstanding the absence of Eastern District authority, in my opinion a persuasive argument can be made that under Virginia law debtor was a trustee under a technical trust. However, I find it unnecessary to decide this issue because, as set forth below, a more compelling basis exists to except the Metis debt from debtor's discharge.

LARCENY

Second, a debt may be excepted from discharge if the debtor commits larceny. "Bankruptcy courts are not bound by state law definitions of larceny but may instead follow federal common law that defines larceny as the 'felonious taking of another's personal property with intent to convert it or deprive the owner of same.'" *Johnson v. Davis*, 262 B.R. at 672 (quoting *Clarendon Nat'l Ins. Co. v. Barrett (In re Barrett)*, 156 B.R. 529, 533 (Bankr. N.D. Tex. 1993). Thus, the federal common law definition of larceny requires a wrongful taking and carrying away of the property. In this case, debtor was authorized to receive the funds from Metis clients and deposit them into the corporation's account. Although his subsequent withdrawals were wrongful, he did not acquire the funds by illicit means in the first place. Therefore, the debt cannot be excepted from discharge on grounds of larceny.

EMBEZZLEMENT

Third, a debt may be excepted from discharge if the debtor commits embezzlement. Under federal common law, embezzlement requires a showing that "(1) the person was lawfully

13

entrusted with property or property lawfully came into the hands of that person, and (2) the property was fraudulently appropriated." *Johnson v. Davis*, 262 B.R. at 671. Embezzlement is distinct from larceny. With embezzlement, the wrongdoer initially acquires the property legally, whereas larceny requires felonious intent at the time the property is acquired. *Id*. Critically, "[f]raudulent intent may be determined from the surrounding facts and circumstances of the case." *Id*.

In this case, abundant evidence points to embezzlement by debtor. As he had responsibility for running the financial affairs for Metis, he legally acquired the funds at issue in the case, merely depositing payments from Metis's clients. However, the facts and circumstances surrounding his withdrawal of those funds and the establishment of separate bank accounts is indisputable evidence of embezzlement.

The trial testimony shows that debtor had no agreement with Caviness permitting him to take personal loans from the Metis accounts. Nevertheless, he withdrew and wrote checks for tens of thousands of dollars of corporation funds for his own benefit. When finally confronted over the phone by Metis's attorney Smith with evidence of his transgressions, debtor immediately apologized and admitted his betrayal of Caviness's trust. He later made substantially the same admission to Katrin Mattoon, another Metis employee.

Despite acknowledging his misappropriation of funds, debtor proceeded to open a bank account with BB&T so that he could continue shuttling Metis money for his own use. To open the account, debtor fraudulently misrepresented himself to the bank as the president and CEO of Metis and concealed the account's existence from Caviness by requesting that all statements be sent to his home mailing address. Although he did use this account, in part, to pay Metis

vendors, he also withdrew large sums to pay his own bills, again without disclosing this fact to Caviness. When the BB&T account was discovered and subsequently closed by Caviness, debtor promptly opened a new account in the Metis name with Bank of America, again without informing his employer. There can be little question that debtor's pattern of deceit and dissembling permitted his fraudulent misappropriation of Metis funds.

The question then remains as to the amount of the debt that should be excepted from discharge. Caviness bore the unenviable task of attempting to reconcile the myriad of withdrawals, deposits, debit card transactions, and unclear checks with the bank statements and QuickBooks records of the company. Caviness's commendable efforts showed her willingness to credit debtor for particular deposits and the likely legitimate expenses interwoven amongst his fraudulent withdrawals. On the other hand, debtor failed to provide sufficient information to fully document many of his transactions. Nevertheless, plaintiff bears the burden of proving that a debt is nondischargeable.

The court finds that there is more than sufficient evidence to support a finding that a total in the amount of $134,377.38 should be excepted from debtor's discharge in bankruptcy. This figure is derived from debtor's unauthorized withdrawals from the Metis Wachovia Bank account in the total amount of $96,783.14 and from the BB&T account in the amounts of $4,939.45 (debit card transactions) and $32,654.79 (payments to debtor or for his benefit). The evidence is not sufficient to establish that the undocumented $48,144.25 withdrawn from the BB&T account should be excepted from discharge.

For the reasons stated, judgment will be entered against debtor defendant Jimmie Alan Lane in the amount of $134,377.38, which judgment will be excepted from defendant's

discharge under Count II of plaintiff's complaint pursuant to 11 U.S.C. § 523(a)(4). Counts I and

III of the complaint will be dismissed. A separate order will be entered.


SIGNED:   February 28, 2011

                                     /s/ Douglas O. Tice Jr.
                                    DOUGLAS O. TICE JR.
                                    CHIEF UNITED STATES BANKRUPTCY JUDGE

Copies to:

**Teresa Caviness**
c/o W. R. Baldwin, III, Esq.
5600 Grove Ave.
Richmond, VA 23226

**Jimmie Alan Lane**
301 Cheswick Lane
Richmond, VA 23229

**William R. Baldwin, III**
Marchant, Thorsen, Honey, Baldwin & Meyer
5600 Grove Avenue
Richmond, VA 23226-2102

**W. Reilly Marchant**
Marchant, Thorsen, Honey, Baldwin & Meyer
5600 Grove Avenue
Richmond, VA 23226-2102

**Sandra Renee Robinson**
Robinson Law & Consulting Firm, P.C.
P.O. Box 503
Richmond, VA 23218

**Kevin J. Funk**
DurretteCrump PLC
1111 East Main Street, 16th Floor
Richmond, VA 23219

**Harry Shaia, Jr.**
Chapter 7 Trustee

8550 Mayland Drive
Richmond, VA 23294

**Shannon Franklin Pecoraro**
Office of the U.S. Trustee
701 E. Broad Street, Suite 4304
Richmond, VA 23219